**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ROSSER INTERNATIONAL, INC. and )
APOSTOLOU ASSOCIATES/ROSSER )
INTERNATIONAL JOINT VENTURE )
PARTNERS, )
                )
        Consolidated Plaintiffs, )
                )
    v. )      Civil Action No. 2:11-cv-1028
                )
WALTER P. MOORE & ASSOCIATES, INC., )
                )
        Defendant. )
_____

ARROWOOD INDEMNITY COMPANY, )
                )
        Intervenor/Plaintiff, )
                )
    v. )
                )
APOSTOLOU ASSOCIATES, INC., ROSSER )
INTERNATIONAL, INC., APOSTOLOU/ )
ROSSER INTERNATIONAL JOINT VENTURE )
PARTNERS, and WALTER P. MOORE AND )
ASSOCIATES, INC. )
                )
        Intervenor/Defendants. )

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

      This case is one of several lawsuits arising out of the design and construction of the

Petersen Events Center ("PEC") on the University of Pittsburgh's ("Pitt") Oakland campus,

where Pitt's men's and women's basketball teams have hosted games since 2002.[1]  (Docket No.

24).  The architects on the project, Plaintiffs Rosser International, Inc. ("Rosser") and Apostolou

---

[1]     *See e.g., University of Pittsburgh Commonwealth System of Higher Education v. Apostolou Associates, et al.*, GD-04-029063 (C.P. Allghy Cty filed 2004); *Commonwealth of Pennsylvania Department of General Services v. United States Fidelity & Guaranty Co., et al.*, GD-04-029062 (C.P. Allghy Cty filed 2004).

Associates/Rosser International Joint Venture Partners ("Joint Venture") as well as former plaintiff Apostolou Associates ("Apostolou"), lost a multi-million dollar verdict in the Court of Common Pleas of Allegheny County wherein they were found liable for negligence in the design and construction of the arena in claims brought against them by Pitt. (*Id.*). They also settled a second, similar lawsuit brought against them in state court by the Department of General Services ("DGS"). (*Id.*). Plaintiffs now seek to have engineering firm Defendant Walter P. Moore & Associates ("Moore") pay a portion of their defense costs incurred in the state lawsuits, which have exceeded $3,000,000.00, to date. (*Id.*). The instant claims do not rely on an indemnification or contribution theory arising from any asserted negligent act or omission by Moore in its limited role providing engineering support for the design and construction of the arena. (*Id.*). Instead, they allege that Moore breached a Joint Defense Agreement ("JDA") between the parties, which purportedly obligates Moore to pay a *pro rata* share of the defense costs for the two state lawsuits. (*Id.*).

The parties have filed cross motions for summary judgment proffering competing interpretations of the JDA. (Docket Nos. 126, 130). Said motions have been exhaustively briefed by the parties. (Docket Nos. 126-147). After careful consideration of the parties' positions, it is this Court's opinion that the JDA is unambiguous and that the only reasonable interpretation of same is that it did not obligate Moore to pay a *pro rata* share of the defense costs for the state lawsuits and, alternatively, even if the JDA is interpreted to contain an ambiguity and the extrinsic and parol evidence submitted by the parties is considered, there is still insufficient evidence in the record upon which a reasonable jury could find in Plaintiffs' favor. For these and the other reasons discussed below, Moore's motion for summary judgment [126] is granted and Plaintiffs' motion for summary judgment [130] is denied.

## II. FACTUAL BACKGROUND

### A. The Design and Construction of the Petersen Events Center

The PEC is a multi-purpose arena facility located on Pitt's Oakland campus. *See* History of Petersen Events Center, *available at:* http://www.peterseneventscenter.com/ (last visited 7/30/13). The facility opened in 2002 and now hosts Pitt's men's and women's basketball games, major concerts and other events. *Id.* Apostolou, Rosser and the Joint Venture were the architects of record for the design and construction of the facility. (Docket Nos. 127 at ¶ 3; 138 at ¶ 3). These entities then subcontracted with Brinjac Engineering ("Brinjac") to provide structural engineering consulting as well as mechanical, electrical, and plumbing design and consultation for the project. (*Id.* at ¶ 4). Brinjac, in turn, subcontracted with Moore to provide structural engineering as it related to the design of the high roof for the arena. (*Id.* at ¶ 5). Given these relationships, Moore had no direct contractual agreement with Apostolou, Rosser or the Joint Venture. (*Id.* at ¶ 6). Aside from the Joint Venture, which did not have a separate insurance policy, all of these entities were insured under policies issued by the same insurance company, DPIC, predecessor to Intervenor Plaintiff Arrowood Indemnity Company ("Arrowood"). (*Id.* at ¶ 10).

At some point, problems associated with the design and construction of the PEC became evident, particularly issues with the roof design and attendant leaking problems. In 1999, DPIC appointed attorney Robert Ray, Esquire and the law firm of Burns White & Hickton[2] ("Burns White") to represent Rosser, Apostolou, the Joint Venture and Brinjac in matters concerning the PEC. (Docket Nos. 127 at ¶¶ 11, 14; 138 at ¶ 11, 14). Apostolou also employed Maurice

---

[2]    Burns White & Hickton is now known as Burns White given that one of its former named partners, the Honorable David Hickton, left private practice and is presently the U.S. Attorney for the Western District of Pennsylvania. *See Burns White, Attorneys at Law, available at:* http://www.burnswhite.com (last visited 7/30/13); *see also, The United States Attorney's Office, Western District of Pennsylvania, "Meet the U.S. Attorney", available at:* http://www.justice.gov/usao/paw/meetattorney.html (last visited 7/30/13).

Nernberg, Esquire as its personal counsel. (Docket No. 132 at ¶ 11). Later, in 2002, Arrowood or its predecessor, appointed attorney Andrew Fylypovych, Esquire[3] of McKissock and Hoffman to represent Moore in any such disputes. (Docket Nos. 127 at ¶ 12; 138 at ¶ 12).

### B. The State Cases

Litigation over the roof problems with the PEC ensued in 2004 and 2005. The first lawsuit was brought by Pitt against Rosser, Apostolou and the Joint Venture in December 2004, alleging that they committed errors and omissions in their work on the PEC project ("Pitt lawsuit"). (Docket No. 132 at ¶ 1). A second lawsuit was initiated by DGS alleging defects in the roof of the PEC ("DGS lawsuit") to which Rosser, Apostolou and the Joint Venture were added as third-party defendants in 2005. (*Id.* at ¶ 2). Neither Moore nor Brinjac were ever added as parties to the state lawsuits. (Docket Nos. 127 at ¶ 9; 138 at ¶ 9). The attorney appointments previously made by Arrowood's predecessor remained after the lawsuits were filed. (Docket No. 132 at ¶ 8). As such, Attorney Ray and Burns White continued to represent Apostolou, Rosser, the Joint Venture and Brinjac in regards to the state litigation. (Docket Nos. 127 at ¶¶ 11, 14; 138 at ¶ 11, 14). Attorney Nernberg remained as personal counsel to Apostolou. (Docket No. 132 at ¶ 11). Attorney Fylypovych of McKissock and Hoffman represented Moore in these matters. (Docket Nos. 127 at ¶ 12; 134 at ¶ 12).

### C. Initial Proposal of a Joint Defense Agreement and Purpose of Same

The concept of these entities entering into a joint defense agreement was initially proposed by Attorney Ray in 2005 when he recommended same to a number of insurance adjusters at DPIC. (Docket Nos. 127 at ¶ 17; 138 at ¶ 17). To this end, Attorney Ray sent the following missive on January 6, 2005:

---

[3]     Attorney Fylypovich later joined Burns White and is presently a partner with that firm. *See Burns White, Profile Andrew Fylypovych, Esq. available at:* http://www.burnswhite.com/attorneys_detail.php?AttorneyID=104 (last visited 7/30/13).

4

> I recommend entering into a joint defense agreement between
> Apostolou Rosser, Brinjac, Walter P. Moore and other involved
> consultants under which the parties work together, **share costs**,
> hold off on joinders and reserve all claims between them until this
> matter is concluded. I will forward a draft of a joint defense
> agreement in the near future.

(Docket No. 133-1 at 16, Pl. Ex. 3 (emphasis added)). There is no evidence that Attorney Ray or

any of the recipients forwarded this precise email communication to representatives of any of the

entities which later became a party to the JDA, including Moore. *Id.* However, the evidence

submitted to the Court shows that representatives of Moore and Rosser were aware of Attorney

Ray's recommendation that a joint defense agreement be entered into by the parties. (Docket

Nos. 132 at ¶ 9; 134 at ¶ 9). To this end, email communications among representatives of Rosser

and Moore on January 14, 2005 disclose that DPIC had engaged Fylypovych to represent Moore

in the litigation. (*Id.*; Pl. Ex. 2). In the same email trail, Ray Messer of Moore also indicates to

Noah Long of Rosser that he instructed Fylypovych to contact Attorney Ray to discuss the

potential joint defense agreement. (*Id.*). Attorney Ray testified that he likely discussed the JDA

with Moore's attorney, Fylypovych, at the outset of the litigation, although he could not recall

the specifics of any such conversation. (Docket Nos. 127 at ¶ 18; 138 at ¶ 18). Despite his

reference to cost sharing in his email, Attorney Ray explained his recollection of the purpose of

the parties entering into the joint defense agreement, as follows:

> to the extent we can avoid joining other parties that are a part of
> the design team, our standard practice is to try not to do that,
> because it's not helpful with the litigation. So we discussed
> entering into a joint defense agreement where the parties would
> generally agree to work together to defend the case. We would talk
> about it in terms of preserving a joint defense privilege that would
> be necessary for – you know, you don't really need it in writing,
> but it's best to be in writing that we have a formal written joint
> defense privilege and so that would be what we talked about.

(Docket Nos. 127 at 18; 138 at ¶ 18; *Ray Depo* at 34-35).

*D. Early Drafts of the Joint Defense Agreement and the Parties' Negotiations*

The JDA was prepared and revised by attorneys at Burns White, with Attorney Ray serving as lead counsel. (Docket Nos. 127 at ¶ 18; 134 at ¶ 18). Burns White attorneys Chad Wissinger, Esq. and Benjamin Sorisio, Esq. were also involved in drafting the JDA language at different times. *Id.* The first draft that was discovered by the parties is dated January 19, 2005 ("January 2005 draft"). (Docket Nos. 132 at ¶ 13; 134 at ¶ 13). This initial draft contained a number of provisions which were substantially amended in later versions and contained certain factual information which was incorrect. (Docket Nos. 132 at ¶¶ 14-16; Pl. Ex. 4). To this end, the January 2005 draft: referenced only one of the two state lawsuits; stated that Burns White would be jointly representing all of the JDA parties; noted that the JDA parties had waived potential conflicts of interest as a result of Burns White's joint representation, but stated that Burns White may be forced to withdraw if a conflict later arose; and contemplated that the parties would fully execute same in January of 2005. (*Id.*). The January 2005 draft stated that the JDA parties were seeking to preserve the status quo and toll all applicable statutes of limitation regarding any potential claims between them. (Docket Nos. 132 at ¶¶ 17-18; 134 at ¶¶ 17-18). The initial version of paragraph 5 provided that:

> Each of the Parties agree that counsel for the Parties shall assert all defenses to direct claims against each of them and any cross-claims by any other entity, which may result in the dismissal of one or more of the Parties in the event any of the Parties are joined in this Lawsuit or in the event a subsequent lawsuit or arbitration is filed. It is further understood that each of the Parties may have a right of contribution or indemnity against the other, which will not be asserted in the pleadings filed on behalf of each of the Parties. Each of the Parties agree that if one, but not all, of the Parties are dismissed from the Lawsuit, each of the Parties will participate in the defense of this Lawsuit as though the dismissed Party were an additional defendant in this Lawsuit. Each of the Parties waive any objection to joinder at any time in the future, waive any defense of late joinder, laches, or statute of limitations between these parties

and **[specifically agree that at any point in this Lawsuit if the other Party wishes to assert a cross-claim against the other Party, each Party consents to the filing of a cross-claim, or to consent to the filing of a stipulation that a cross-claim is asserted, as requested by the Party wishing to assert a cross-claim]. [BOB – DO WE WANT TO INCLUDE THIS?]**

(Pl. Ex. 4 at ¶ 5, Docket No. 133-1 (emphasis in original)).

Another draft of the joint defense agreement was prepared by Burns White attorneys in July of 2005 ("July 2005 draft"). This revised version corrected the factual mistakes which were present in the January 2005 draft and thus: included references to the fact that two lawsuits had been filed in state court; deleted the references to Burns White representing all parties and waiving potential conflicts; and deleted the reference to execution of the agreement in January of 2005. (Docket No. 133-1, Pl. Ex. 5 at 22-27). In obvious error, this document contains two paragraphs labeled "4.", one of which contained similar language to paragraph 5 in the January 2005 draft. (*Id.*). That provision now read, as follows:

> Each of the Parties agree that counsel for any of the Parties who are named in the Lawsuits shall assert all defenses to direct claims against any of them and any cross-claims by any other entity, which may result in the dismissal of one or more of the Parties in the event any of the Parties are joined in this Lawsuit or in the event a subsequent lawsuit or arbitration is filed. It is further understood that each of the Parties may have a right of contribution or indemnity or other claim against the others, which will not be asserted in the pleadings filed on behalf of each of the Parties. Each of the Parties agree that if one, but not all, of the Parties are dismissed from the Lawsuit or if a Party is not joined in the lawsuit, each of the Parties will participate in the defense of this Lawsuit as though the dismissed or not-joined Party were an additional defendant in this Lawsuit until all Parties are dismissed. Each of the Parties waive any objection to joinder at any time in the future by any of the Parties, waive any defense of late joinder, laches, or statute of limitations between these Parties, and each of the Parties agrees to work jointly to defend the Lawsuits.

(*Id.* at ¶ 4). On July 28, 2005, the legal secretary to Attorneys Ray and Wissinger, Desirae L.

Thomas, sent an email to representatives of the JDA parties, on Attorney Ray's behalf, requesting that the July 2005 draft be reviewed and that any comments be circulated. (*Id.* at 23).

Ms. Thomas apparently received no responses to her June 28, 2005 email as the evidence shows that Attorney Sorisio recirculated the same draft by email to the JDA parties a second time on October 6, 2005. (Docket Nos. 132, 134 at ¶ 22). This then led to some suggested changes by Attorney Nernberg. To this end, he stated with respect to ¶ 4 that:

> Although the term "participate" is ok (Para. 4 – the first one), I would make the obligation to cooperate more detailed, i.e., shall share in the cost of experts whose employment can be used in their own defense, voluntarily attend meetings and provide information, all as though they have been named.

(*Id.* at ¶ 25). Nernberg also requested that Sorisio share his comments with the remainder of the interested parties and he did so in an email dated October 11, 2013. (*Id.*). In said email, Attorney Sorisio notified all of the recipients that he would be modifying the draft to include Attorney Nernberg's suggested changes. (*Id.* at ¶ 27).

Soriso made the requested changes and circulated yet another draft of the agreement on October 24, 2005. (*Id.* at ¶ 28). After incorporating Mr. Nernberg's suggested changes, paragraph 4 was revised, as follows:

> Each of the Parties agree that counsel for any of the Parties who are named in the Lawsuits shall assert all defenses to direct claims against any of them and any cross-claims by any other entity, which may result in the dismissal of one or more of the Parties in the event any of the Parties are joined in the Lawsuits or in the event a subsequent lawsuit or arbitration is filed. It is further understood that each of the Parties may have a right of contribution or indemnity or other claim against the others, which will not be asserted in the pleadings filed on behalf of each of the Parties. Each of the Parties agree that if one, but not all, of the Parties are dismissed from the Lawsuits or if a Party is not joined in the Lawsuits, each of the Parties will participate in the defense of the Lawsuits, **share in the cost of experts whose employment can be used in the Party's own defense, voluntarily attend meetings**

> **and provide information as though the dismissed or not-joined Party were an additional defendant in the Lawsuits until all Parties are dismissed.** Each of the Parties waive any objection to joinder at any time in the future by any of the Parties, waive any defense of late joinder, laches, or statute of limitations between these Parties, and each of the Parties agrees to work jointly to defend the Lawsuits.

(*Id.* at ¶ 29 (emphasis added)). On the same day, Attorney Fylypovych responded on behalf of Moore, stating that "[t]he agreement is fine with my client" but noted a typographical error in the second "WHEREAS" clause of same. (*Id.* at ¶¶ 30-1). In turn, Sorisio advised that he would make this minor change and further advised Fylypovych that he could execute the agreement on behalf of Moore, if Moore authorized him to do so. (*Id.* at ¶ 32). A few days later, Nernberg responded to Sorisio's latest draft and suggested additional changes to paragraphs 1, 5, and 7 and also added new paragraphs 8 and 9. (*Id.* at ¶ 33). Sorisio acknowledged these suggestions and noted that he would make the requested changes and recirculate a revised draft. (*Id.* at ¶ 35).

### E. The Final Version of the JDA

Sorisio followed through and circulated another version of the JDA attached to a November 12, 2005 email, wherein he advised everyone that he had incorporated all of the changes requested by counsel. (*Id.* at ¶ 36). This document became the final version of the JDA which is at issue in the instant litigation. (Pl. Ex. 1). The JDA is a brief, 4-page agreement, with four introductory "whereas" clauses followed by ten substantive paragraphs. (*Id.*).

The preamble to the JDA recognizes that Apostolou, Rosser and the Joint Venture were named as parties in the state lawsuits and that "neither Brinjac nor Moore have been joined" in the state lawsuits but states that "[t]he parties wish to defend the Lawsuits jointly for their mutual interests." (*Id.* at 1). The JDA contains specific provisions regarding confidentiality, the

assertion of the joint defense privilege and non-disclosure of the agreement. (*Id.* at ¶¶ 2, 3, 9).

The JDA then provides, in pertinent part, that:

> 1. This Agreement is entered into for the purposes of preserving the status quo between the Parties, presenting a joint defense, maintaining confidentiality and tolling any and all applicable statutes of limitations or repose with respect to the assertion and/or adjudication of any claims, including, but not limited to, claims of negligence, contribution, breach of contract, indemnification, exoneration, payment or otherwise, which exist or may arise by and between the Parties arising out of or relating in any way to the claims asserted by the Claimants in the Lawsuits.
>
> …
>
> 5. Each of the Parties agrees that counsel for any of the Parties who are named in the Lawsuits shall assert all defenses to direct claims against any of them and any cross-claims by any other entity, which may result in the dismissal of one or more of the Parties in the event any of the Parties are joined in the Lawsuits or in the event a subsequent lawsuit or arbitration is filed. It is further understood that each of the Parties may have a right of contribution or indemnity or other claim against the others, which will not be asserted in the pleadings filed on behalf of each of the Parties. Each of the Parties agrees that if one, but not all, of the Parties are dismissed from the Lawsuits or if a Party is not joined in the Lawsuits, each of the Parties will participate in the defense of the Lawsuits, share in the cost of experts whose employment can be used in the Party's own defense, voluntarily attend meetings and provide information as though the dismissed or not-joined Party were an additional defendant in the Lawsuits.

(*Id.*). The JDA was executed at different times by the JDA Parties or their authorized representatives. (Docket No. 133-1, Pl. Ex. 1). To this end, Apostolou signed the JDA on 11/15/05; Rosser International, Inc. signed the JDA on 11/17/05; WPM's authorized counsel, Fylypovych signed the JDA 1/23/07; Brinjac signed the JDA on 2/13/07; and the Joint Venture signed the JDA on 2/19/07. (*Id.*).

> F. *Communications Concerning State Lawsuits and the JDA and Other Evidence of Parties' Intent*

The record reflects that Moore participated with the other JDA Parties during the state

litigation at times throughout 2005 and 2006. (Docket No. 132 at ¶ 43). To this end, Fylypovych corresponded with Sorisio concerning Moore's responses to discovery requests from Cincinnati Insurance Company in September of 2005. (*Id.*). Later, in October of that year, Fylypovych reportedly participated in a strategy conference call with Burns White attorneys about the litigation. (*Id.*). He did so again in March of 2006, during a conference where a number of agenda items were scheduled to be discussed, including: the status of the state lawsuits; potential hiring of expert witnesses; e-discovery options; and possibly moving to dismiss the lawsuits. (*Id.*).

Attorney Ray left Burns White at some point in 2006 and he ceased to represent Apostolou, Rosser, the Joint Venture and Brinjac as of that time. (Docket Nos. 127 at ¶ 13; 138 at ¶ 13). The clients, however, remained with Burns White and its attorneys, with attorney David J. Hickton taking over as lead counsel. (*Id.* at ¶ 29). According to evidence presented by Plaintiffs, Raymond Ashe of Rosser recalls that he discussed the JDA with Mr. Hickton on February 13, 2007. (Docket No. 132 at ¶ 41). During this conversation, which is supported by handwritten notes taken by Ashe contemporaneously with the phone conference, Attorney Hickton purportedly advised Ashe that:

1. the JDA established a "one for all, all for one" relationship among the JDA Parties;

2. one of the purposes of the JDA was for the JDA Parties to "share expenses then figure out who's at fault later";

3. the litigation expenses for Rosser, Apostolou and Brinjac as of that date, including attorneys' fees, totaled $400,000.00; and,

4. Moore had not yet paid anything toward the defense costs but that the JDA Parties were reserving the right to resolve any issues between themselves until after the state cases were concluded.

(*Id.*).

In May of 2007, all of the JDA Parties except for Moore agreed to settle the DGS lawsuit. (Docket No. 132 at ¶ 44). Attorney Fylypovych and Moore's insurance adjuster, Wayne Marshall, communicated to the adjusters for the other parties and their representatives that Moore declined to participate in the settlement because it believed that it had no liability exposure to the suit. (*Id.* at ¶ 45; Def Ex. 11, *Fylypovych Depo* at 50-1). To this end, Attorney Fylypovych testified that he recalled discussing the matter with Marshall and advised him that Moore had "nil exposure" as a result of his review of all of the evidence. (*Id.*). In response to this conversation, Marshall advised adjuster Bob Kampermann at Arrowood via email that:

> I had [a] long discussion with defense counsel regarding Walter Moore's position in this matter. I was informed that Walter Moore performed structural design work that was not, in any way, related to the leaking roof or other issues that are the subjects of this litigation. Further, I was advised that exhaustive expert analysis was undertaken and not one expert has said word one to implicate the design by Walter Moore. In short, I have been advised that my insured has no liability and we will therefore not be contributing to any settlement offers.

(Pl. Ex. 18 at 3 of 4).

Kampermann then forwarded Marshall's email to representatives of Rosser, Apostolou and Brinjac, including Ashe and Attorney Nernberg. (*Id.* at 3 of 4). Ashe responded on behalf of Rosser:

> Philosophically, I don't disagree with Moore's position – but in the same sense, none of us caused the roof to fail. It has always been our collective position that this problem was caused by faulty installation thereby implicating no one's design. The settlement (in my view) is simply the choice that those on the "designer" side of the issue jointly agreed to make in lieu of proceeding through the much costlier process of proving those facts in court. If Moore felt their position (and by extension, our collective position) was so strong, why were they silent throughout the Mediation, the Expert Report Review process and the Pre-Trial Conciliation? And I'm

not entirely convinced that the Thornton Tomasetti report does not implicate Moore's construction administration responsibilities.

(*Id.*). Kamperman replied to this email a few minutes later, stating "I agree. I do not intend to let them off the hook. Once the settlement is finalized I will, with your assistance, pursue Walter P. Moore for their share." (*Id.* at 2 of 4). Attorney Nernberg weighed in on Moore's decision the next morning. In his email, he explains that:

> In some ways, everyone is right and everyone is wrong. Ray put it well, that a settlement is just that, it is not an admission of liability and it clearly was not here. The purpose of the joint defense was to allow the design side of the case to defend without having cross claims against one another, which would only have made things easier for the Plaintiffs.
>
> We only know one thing for certain, that the roof, as constructed, failed. While the contractors blamed the designers, it was clear that they did not follow instructions. From a legal point of view any failure to detect the errors was not a design failure, but we all know that trials do not always comport with our view of the law. Thus, a settlement was effected for convenience.
>
> I would like to see this move on without enmity among the design defendants. While this battle is over, the war is still going on. I think that the Apostolou/Rosser contribution should be equal and not subject to dispute resolution. I think that Brinjac should join in this so the settlement is 1/3 each. If Moore won't contribute, then the three should reserve their rights against Moore as expressed in the proposed consent to settle. However, I would not like to see that Apostolou, Rosser and Brinjac are not settled among themselves. Too often, I have seen situations like this break down in the face of a determined Moore. A united front would be the best way to deal with Moore and to avoid the risk of dissention among the three.
>
> I did not send this to Brinjac, only because I have not had much contact with him. If you believe he will benefit from it, you are free to forward it to him.

(*Id.*). A half an hour later, Kamperman advised Attorney Nernberg that "[w]e will go after Walter P. Moore for their share." (*Id.* at 1 of 4). Kamperman communicated the same in a

separate email to Ashe:

> I have spoken to the adjuster and attorney representing Walter P. Moore & Associates. They are taking a no pay position. I will continue to pursue them but I do not want to risk the total settlement of $775,000.00 which I believe is a good one. I have allowed for reallocation in the Consent To Settle Form and will continue to pursue Walter P. Moore & Associates.
>
> Please sign the attached Consent To Settle Form and the Release so I can wire transfer the funds and avoid risking the settlement.

(Pl. Ex. 19). However, Kamperman followed up the next day advising that he wanted to "change the language" of the Consents to Settlement because he "want[ed] to avoid arbitrating between your firm, Apostolou, and Brinjac and just concentrate on pursuing Moore. Moore is the party that will not contribute." (Pl. Ex. 20). The Consent to Settle, which was agreed-to and fully executed, provides that:

> Nothing herein is intended to modify the Joint Defense Agreement between the joint venture of Apostolou Associates/Rosser International, Inc., Apostolou Associates, Inc., Rosser International, Inc., Brinjac Engineering, Inc. (formerly Brinjac, Kambic and Associates) and Walter P. Moore & Associates, including any rights thereunder.
>
> A separate right of recovery may exist against Walter P. Moore & Associates, including, but not limited to, rights preserved in the Joint Defense Agreement. Walter P. Moore & Associates has refused at this time to contribute to the settlement. Walter P. Moore & Associates may have to be pursued through litigation.

(Pl. Ex. 21).

The trial of the Pitt lawsuit was scheduled to commence in late fall of 2010. A few months before the trial, in July of 2010, the attorneys for Apostolou, Rosser, and the Joint Venture communicated about Moore's potential attendance/participation in a settlement conference in that litigation. Attorney Nernberg commented at that time that:

> According to Paragraph 5 [of the JDA], there is not only an

14

obligation to cooperate, which I understand Moore has done, but also a duty to share in the cost of experts "whose employment can be used in a Party's own defense." I expect some of the issues are Moore issues and Moore should have to contribute to the expert costs. It also provides for each to participate in the defense. Is Moore doing so? Moore's attorney, Fylypovych is with [Burns White], but is he participating in the action? Is his insurer contributing to the defense cost?

…

Unless there is more, I see no reason why the settlement conference cannot be concluded without Moore and, if settlement is achieved, an action against Moore for his share of defense costs.

(Pl. Ex. 22). It is undisputed that the Pitt lawsuit was tried, with Pitt winning a multi-million dollar verdict against Rosser, Apostolou and the Joint Venture. Moore was never added as a party to that litigation and did not contribute to the defense costs for same. (Docket Nos. 127 at ¶ 9; 134 at ¶ 9). The parties do not contest that Brinjac agreed to fund the defense costs for the Pitt litigation through its insurance coverage issued by Arrowood.

### G. Other Evidence of Parties' Intent

The record evidence before the Court also includes deposition testimony of many of the attorneys who were involved in the drafting and negotiation of the JDA, such as: Attorney Nernberg, who served as personal counsel to Apostolou; Attorneys Ray and Sorisio of Burns White, who represented Plaintiffs, Apostolou and Brinjac; and Attorney Fylypovych, who represented Moore. [4] (See Pl. Exs. 1-24; Def. Exs. 1-11).

Attorney Nernberg testified at his deposition that he did not recall any specific oral

---

[4] The Court notes that Moore has also presented the expert report of Joseph Christof, II, Esquire of Dickie McCamey, wherein he opines, among other things, that his interpretation of the JDA is that it does not contain any cost sharing language. (Def. Ex. 8, *Christof Affidavit and Expert Report*). Plaintiffs have objected to the Court's consideration of Mr. Christof's opinion on the basis that his expert opinions constitute improper legal opinions. (Docket No. 143). As is discussed below, the Court sustained this objection because it has determined that summary judgment is appropriately entered in favor of Moore, without any consideration of Mr. Christof's expert opinions contained therein, making the resolution of this dispute unnecessary to the disposition of the instant motions for summary judgment. As such, the Court will not detail Mr. Christof's expert report here.

communications concerning the extent of the parties' obligations under the JDA and that his testimony was based on his review of the email communications between the attorneys at that time.  (Def. Ex. 10, *Nernberg Depo* at 30).  He then explained the content of his October 2005 emails and the proposed language he suggested adding to the JDA in the following manner:

> Q. You use the phrase, more detailed. In saying that and in providing some suggested additional language there, were you saying that you wanted the participation clause to be more limited?
>
> A. No. More expanded into defining what participation consists of.
>
> Q. Is it fair to say that you were not attempting, by this language, to narrow any of the parties' obligations under the joint defense agreement?
>
> A. No. Rather to clarify exactly what they were to do. It was not ultimately defined in the final agreement, and "participate" remained in.
>
> That's what I meant by saying, the term participate is okay, but I anticipated it would then be defined afterwards. It never was defined, merely said participate, and identified some areas.
>
> Q. And the various examples that you itemized here, was it your intention or expectation that that would be an exhaustive list or exhaustive illustration of participate.
>
> * * *
>
> A.  I was simply using an example for someone to flesh out.

(Def. Ex. 7, *Nernberg Depo* at 63-64).  Attorney Ray testified that he completed the initial draft of the JDA and approved the final version which was executed by the JDA Parties.  (Def. Ex. 4, *Ray Depo* at 79-81).  He further explained that the initial version did not include any cost allocations among the parties and that the final version did not include any statements concerning the allocation of defense costs among the JDA Parties.  (*Id.*).  He also provided some clarification as to what he communicated to Mr. Hickton upon his departure from Burns White

and transferring the file to him.  (*Id.*).  Attorney Ray testified as follows:

Q. An[d] you approved of the [JDA] when it got signed?

A. I did.

Q. And in that document we were talking about that you wouldn't include how the allocation of legal fees in a joint defense agreement.

Do you remember making that statement?

A. I created the original [JDA] without any kind of allocation.

Q. Okay. Was there any sort of allocation included in the [JDA]?

A. The only allocation of things was the language that Maurice [Nernberg] added, that I recall: ". . . share in the cost of experts whose employment can be used in the Party's own defense . . ."

* * *

Q. Do you view the version of the joint defense agreement that you have in front of you allocating legal fees in any manner?

A. I'm not sure that it allocates any fee – any kind of cost or legal fees.

Q. Okay.

A. I mean, it says they're going to share in the cost of experts whose employment can be used, but it doesn't indicate that everybody's going to split equally every expert, so . . .

Q. Okay. Do you view this document, the joint defense agreement, as requiring any of the parties in it to share in the payment of legal fees?

A. There's no language in this agreement to say that.

Q. This is the language that you agreed would be the final form that would be signed by the Parties?

A. Yes.

Q. Prior to your departure from the firm, so prior to your departure

back in time, did you ever discuss with David Hickton the terms and conditions of the joint defense agreement?

A. Prior to my departure? I doubt it. I can't say for sure.

Q. Do you know if Mr. Hickton ever reviewed the joint defense agreement prior to your departure from the firm?

A. I don't think he would have.

Q. Did you consult Mr. Hickton in any way about the terms of the joint defense agreement prior to your departure?

A. Not this joint defense agreement. I would probably have consulted him about joint representation of the parties.

(Def. Ex. 4, *Ray Depo* at 79-81). Attorney Sorisio, the associate who made some changes to the JDA and exchanged emails with counsel and the parties, testified that it was his:

> understanding under the fully executed joint defense agreement, that the payment of attorneys' fees and sharing in that, that the payment of attorneys' fees was not contemplated by the joint defense agreement. The sharing of any costs were about the cost of experts whose employment can be used in the parties' own defense.

(Def. Ex. 6, *Sorisio Depo* at 175). With respect to his interpretation of the JDA, Attorney Fylypovych stated that:

> [t]he [JDA], I think in my mind, is very clear on that issue. Also, in reviewing the documents that were sent to me this morning, and mind you, it was a very quick perusal, there appears to be e-mail traffic from Attorney Nernberg, who I think represented at least one of the joint venture members, his personal counsel; and he was rather vociferous in his participation in various proceedings in these cases, and I don't see anything in his suggestions and recommendations that even remotely touches on some sort of a suggestion that anyone participate in the sharing of overall defense costs or any other costs with the exception of the expert fees. And I might add, I recall seeing the e-mail in there in which he is the person that actually expands the concept of what cooperation is all about; and he certainly doesn't say anything about sharing defense costs in that clause.

(Def. Ex. 6, *Fylypovych Depo* at 13-14).

III. PROCEDURAL HISTORY

The instant case brought by Plaintiffs Rosser and the Joint Venture was initially one of two actions which were filed in the Court of Common Pleas of Allegheny County and then removed to this Court by Moore. *See* Civ. A. Nos. 11-1028, 11-1041. The second case was filed by Apostolou. Moore sought dismissal of both cases through two Rule 12(b)(6) motions to dismiss. (Docket Nos. 11, 30). The first motion to dismiss was denied, as moot, after the Plaintiffs and Apostolou filed amended complaints. (*See Text Order 9/20/11*). The second motion to dismiss was denied, without prejudice, as the Court determined that the parties had presented matters outside the pleadings in their respective arguments and converted the motions to summary judgment motions under Rule 12(d), to be renewed at the conclusion of discovery. (Docket No. 41). After the amended complaints were answered by Moore, the parties consented to Arrowood's motion to intervene and the Court granted same. (Docket No. 50). As is more fully set forth in its Amended Intervenor Complaint, Arrowood has intervened in this action because it is the insurer for all of the parties to the instant case and believes it has a right to any damages Plaintiffs may recover from Moore in this case. (Docket No. 38). Apostolou voluntarily discontinued its case and the same was dismissed by the Court as of April 11, 2012. (Docket Nos. 75, 76)

During the pendency of this litigation, the parties participated in the Court's Alternative Dispute Resolution Program (Docket No. 34) and, aside from Apostolou's decision to discontinue its action and the dismissal of certain claims between Moore and Arrowood, the disputes at issue in this case which were raised in the initial motions to dismiss concerning the

interpretation of the JDA, remain.[5] After discovery was completed, the parties advised the Court at a status conference that further settlement efforts would not be fruitful and requested that summary judgment deadlines be set. Pursuant to the Court's deadlines, and as is detailed below, the parties exhaustively briefed[6] the pending cross motions for summary judgment. (Docket Nos. 126-147).

After reviewing most of the parties' filings, the Court concluded that oral argument was unnecessary prior to ruling on the pending motions and therefore, cancelled a previously scheduled motion hearing set for May 10, 2013. (Docket No. 139). The parties' motions are now been fully briefed and are ripe for disposition.

## IV. LEGAL STANDARD

The legal standard governing motions for summary judgment is well-settled. To this end, Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Pursuant to Rule 56, the Court must enter summary

---

[5] The Court notes that this case was also referred at the parties request to one of our Magistrate Judges, the Honorable Maureen P. Kelly, who convened a global settlement conference in an effort to resolve this matter as well as the pending litigation in state court involving these entities and Pitt, which agreed to appear despite being a non-party to this litigation. (*See* Docket Nos. 42, 45, 49, 99). From the entries on the docket, the global settlement conference consisted of a number of telephone conferences with counsel and in-person sessions with counsel and party representatives but, despite the repeated efforts of Judge Kelly and the participants, the cases did not resolve during this process. (Docket Nos. 66, 67, 91, 108, 113;Text Orders of 2/10/12, 4/9/12, 8/30/12).

[6] The relevant filings as to Moore's motion for summary judgment are as follows. On March 6, 2013, Moore filed its: Motion for Summary Judgment; Concise Statement of Material Facts; Appendix and Brief in Support. (Docket Nos. 126-129). Plaintiffs responded by filing their Memorandum in Opposition and Response to Moore's Concise Statement of Material Facts on April 8, 2013. (Docket Nos. 137-38). Moore filed a Reply Brief on April 16, 2013. (Docket No. 140). Not to be outdone by the parties, on April 17, 2013, Arrowood filed its Reply to the "Reallocation" Remedy Belatedly Sought by Rosser and Appendix. (Docket Nos. 141-42). Plaintiffs then filed their Response to Arrowood's arguments on April 24, 2013. (Docket No. 144).

The parties have also made the following filings with respect to Plaintiffs' partial motion for summary judgment. On March 7, 2013, Plaintiffs filed their: Motion for Summary Judgment; Brief in Support; Concise Statement of Material Facts; and Appendix. (Docket Nos. 130-33). Moore responded on April 8, 2013 with its: Response to Plaintiffs' Concise Statement of Material Facts; its own Appendix; and Brief in Opposition. (Docket Nos. 134-36). Plaintiffs submitted their Reply Brief on April 22, 2013. (Docket No. 143). After receiving leave of court, Moore filed its Sur-Reply Brief on May 2, 2013. (Docket No. 147).

judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine dispute of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

V.  DISCUSSION

The disputed legal issues in this case surround the parties' competing interpretations of the JDA, which Plaintiffs allege creates an obligation on behalf of Moore to pay a *pro rata* share of defense costs for the two state lawsuits pertaining to the PEC design and construction while Moore maintains that it has no such obligation under the JDA. Pl. Ex. 1. The parties have

argued the case in the alternative, with both initially contending that the JDA unambiguously supports their respective interpretations and later advocating that if the JDA is deemed ambiguous by the Court, that the proffered extrinsic and parole evidence provides conclusive support for their positions. (Docket Nos. 129, 131, 136, 137, 140, 143, 144, 147). After careful consideration of the parties' arguments and the evidence of record, the Court concludes that summary judgment is appropriately entered in favor of Moore and against Plaintiffs as to both motions, for reasons that are fully explained below. However, before addressing the merits of the parties' cross-motions for summary judgment, the Court will briefly describe the relevant legal principles at issue in this case.

### A. Relevant Legal Principles

At the outset, the parties have not raised any choice of law issues in this diversity action and the JDA does not include a choice of law provision. (*See* Docket Nos. 126-147, Pl. Ex. 1). Yet, both sides have argued the applicability of Pennsylvania law to the facts of this case and neither has contended that the laws of some other forum should control. (*Id.*). Thus, the parties have implicitly agreed that Pennsylvania law governs this dispute. This Court likewise holds that under Pennsylvania choice-of-law rules, Pennsylvania contract law is appropriately applied because the JDA was formed for the purpose of defending two lawsuits which were litigated in the Court of Common Pleas of Allegheny County and said lawsuits concerned alleged defects in the design and construction of the PEC on Pitt's Oakland Campus. *See Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, 693 F.3d 417, 432 (3d Cir. 2012) (citation and quotation omitted) (noting that "Pennsylvania applies the … flexible, 'interests/contacts' methodology to contract choice of law questions" and that if a false conflict in the laws of two jurisdictions is present, the law of the forum governs). Accordingly, Pennsylvania has

significant contacts and interests in the resolution of the instant breach of contract claim such that its substantive laws should control. *Id.*

Turning to Plaintiffs' breach of contract claim, they allege that the JDA creates an obligation of Moore to share in the defense costs (including attorneys' fees) which were generated in the state litigation, even though Moore was never added as a party to either of the state lawsuits and neither Plaintiffs nor any of the other JDA Parties has brought a claim for contribution or indemnification against Moore, to date. (Docket No. 24). The Supreme Court of Pennsylvania has recognized that:

> [g]enerally, Pennsylvania adheres to the "American Rule," which states that litigants are responsible for their own litigation costs and may not recover them from an adverse party unless there is express statutory authorization, **a clear agreement of the parties**, or some other established exception.

*In re Farnese*, 609 Pa. 543, 564, 17 A.3d 357, 370 (2011) (emphasis added) (internal quotation omitted). Plaintiffs' claim against Moore relies only on its alleged breach of the JDA and none of the other recognized exceptions to the "American Rule" are relevant here. (Docket No. 24). Therefore, consistent with Pennsylvania law, it is Plaintiffs' burden to demonstrate that the JDA constitutes "a clear agreement" between Plaintiffs, Moore and the other JDA Parties that Moore agreed to pay a *pro rata* share of the defense costs accumulated in the state lawsuits. *In re Farnese*, 609 Pa. at 564. The Supreme Court of Pennsylvania has also clarified that the mere fact that a written contract contains an ambiguity does not, by itself, dictate whether such an agreement may constitute a "clear agreement of the parties" because, as is discussed below, Pennsylvania contractual principles permit the introduction of extrinsic and parole evidence to define ambiguous terms. *Trizechahn Gateway LLC v. Titus*, 601 Pa. 637, 652, 976 A.2d 474, 482-83 (2009) (same). To the extent that such evidence is to be considered, Plaintiffs retain the

burden to demonstrate that a clear agreement of the parties to share defense costs was consummated. *Id.*

The Court also understands the general concept of joint defense agreements and that they are often utilized by parties and insurance companies in complex civil litigation. Like other forms of agreement, joint defense agreements are flexible and can be tailored to meet the needs of the parties in many different factual circumstances. *Cf.* S.M. Seaman & J.R. *Schulze, Allocation of Losses in Complex Insurance Coverage Claims* § 13:6[a] (2012) (noting that participants in joint defense agreements "must tailor the joint defense agreement to meet the needs of the particular joint defense effort and to protect the interests of the participating insurers."). However, the main purpose of a joint defense agreement, which is not disputed in this case, is to establish that the parties to the agreement are involved in a joint defense or have a common interest in the litigation such that they may communicate amongst themselves without waiving the attorney-client privilege held by the clients.[7] *See* Pl. Ex. 1 at ¶ 3 ("The Parties understand that the joint defense privilege applies to the joint defense efforts of the Parties in this Lawsuit."). Pennsylvania courts have recognized that, if properly invoked, the joint defense or common interest privilege will protect from disclosure communications made by parties with a common interest to each other in furtherance of a joint defense to litigation. *See In re Comdemnation by City of Philadelphia in 16.2626 Acre Area*, 981 A.2d 391, 396-97 (Pa. Cmwlth. Ct. 2009). The United States Court of Appeals has likewise recognized the common-interest doctrine as an extension of the attorney-client privilege in the federal courts. *See In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007). A joint defense agreement may

---

[7] The Court notes that Black's defines "joint-defense privilege" as "[t]he rule that a defendant can assert the attorney–client privilege to protect a confidential communication made to a codefendant's lawyer if the communication was related to the defense of both defendants. — Also termed common-interest doctrine; common-interest privilege; common-interest exception." BLACK'S LAW DICTIONARY, "privilege" (9th ed. 2009).

also contain any other terms that the parties have agreed to, including, but not limited to, the development of a joint litigation strategy, the sharing of litigation costs and expenses, or any other terms that they mutually desire to govern the relationship going forward. *See e.g.*, S.A. Masser & S.J. Seagle, *Combining Forces: A Primer on the Joint Defense Agreement in Civil Litigation*, 30 No. 3 Trial Advoc. Q. 7 (2011) ("Through a joint defense agreement, … codefendants have the opportunity to pool resources, exchange information, marshal legal talent and advice, and maintain a unified front against a common litigation foe.").

### B. Relevant Pennsylvania Contract Law Principles

The Court next turns to the specific legal principles underlying Plaintiffs' breach of contract claim in this litigation, wherein they allege that Moore breached the express terms of the JDA.[8] (Docket No. 24). To prevail on their breach of contract claim, Pennsylvania law requires that Plaintiffs establish: "1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." *Church v. Tentarelli*, 953 A.2d 804, 808 (Pa. Super. Ct. 2008) (quoting *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 580 (Pa. Super. Ct. 2003)). "In general, when a party fails to satisfy an express contractual obligation, the lack of performance is a breach of the provision creating that obligation. On the other hand, when there is no provision creating an obligation, a failure to act in a certain way amounts to no more than exercise of privileges reserved in the contract." *John B. Conomos, Inc. v. Sun Co., Inc. (R&M)*, 831 A.2d 696, 707-08 (Pa. Super. Ct. 2003). "When determining an existence of breach premised upon a disagreement by the parties over the terms of the contract, the interpretation of the contract is a matter of law for the Court to decide." *Bral Corp. v. Johnstown*

---

[8] The Court notes that Plaintiffs' claim relies solely on the alleged breach of the terms and conditions of the JDA and they have not alleged that any separate agreements – oral or written – were made between the parties. (*See* Docket No. 24). Accordingly, the Court limits its discussion to the applicable Pennsylvania law governing the interpretation of written agreements.

*Am. Corp.*, Civ. A. No. 3:08-232, 2013 WL 398149, at *3 (W.D. Pa. Jan. 31, 2013) (citations omitted).

Pennsylvania rules of contract interpretation require this Court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne University of The Holy Ghost*, 565 Pa. 571, 590-591, 777 A.2d 418 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy*, 565 Pa. at 591, 777 A.2d 418 (citations omitted). "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* (quotation omitted). If the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.* To this end, Pennsylvania courts generally enforce the unambiguous terms of agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. *See McMullen v. Kutz*, 603 Pa. 602, 617, 985 A.2d 769, 778 (2009) ("freely negotiated agreements entered into at arm's length are generally enforced according to their terms to allow parties the benefit of their bargains."); *see also John B. Conomos, Inc.*, 831 A.2d at 708 ("courts should not [generally] set aside terms on which sophisticated parties agreed.").

If the terms of a contract are ambiguous, extrinsic and parole evidence is admissible to interpret the ambiguous portions of the contract. *Murphy*, 565 Pa. at 591. "A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* "The 'reasonably' qualifier is important: there is

no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn*, 601 Pa. at 653 (citing *Murphy*, 565 Pa. at 591). The ambiguous language of a contract is generally "construed against the [drafting party] and in favor of the other party if the latter's interpretation is reasonable." *Sun Co. v. Pennsylvania Turnpike Comm'n*, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998); *see also Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020, 1023 (Pa. Super. Ct. 1997) (citation omitted) ("As a general rule, agreements will be construed against the drafter only when the terms are ambiguous.").

This Court "may grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'" *Atkinson v. Lafayette College*, 460 F.3d 447, 452 (3d Cir. 2006) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). Even if certain terms of the contract are deemed ambiguous by the court, summary judgment may still be entered in favor of one of the parties if there are no genuine disputes of material fact and it is clear that one of the parties is entitled to judgment as a matter of law. *See McGreevy*, 413 F.3d at 363

### C. Interpretation of the JDA as Unambiguous Agreement

In light of the foregoing, the first step in the Court's analysis of the JDA is to determine if there is an ambiguity present by analyzing the relevant contractual language against the parties' competing interpretations. Both parties have initially argued that the terms and conditions of the JDA are unambiguous but have proffered competing interpretations of same. (Docket Nos. 129, 131). The relevant portion of the JDA that is in dispute, ¶ 5, provides, in pertinent part, that:

> Each of the Parties agrees that if one, but not all, of the Parties are dismissed from the Lawsuits or if a Party is not joined in the Lawsuits, each of the Parties will participate in the defense of the Lawsuits, share in the cost of experts whose employment can be used in the Party's own defense, voluntarily attend meetings and provide information as though the dismissed or not-joined Party

were an additional defendant in the Lawsuits.

Pl. Ex. 1 at ¶ 5.

Moore contends that the plain language of ¶ 5 clearly demonstrates that "[t]he JDA does not provide that the parties agreed in the JDA to fund the defense of the lawsuits by the DGS and Pitt in any manner, including through their respective insurance policies, as alleged by Plaintiffs." (Docket No. 129 at 11). Moore further advocates that:

> [t]he JDA mentions cost-sharing obligations once and only once and that is with respect to expert witness costs "*whose employment can be used in the party's own defense.*" Since the signatories to the JDA chose the singular-possessive term, "party's", the correct interpretation of this cost clause as it *might* apply to WPM is as follows: The *only cost-sharing obligation of the parties will be with respect to the costs of expert witnesses whose employment can be used in WPM's own defense*. There is no other cost-sharing obligation to be found in the JDA, nor can any be implied.

(*Id.* at 12 (emphases in original)). Moore also contends that its interpretation is supported by ¶ 1 of the JDA, wherein the purposes of the agreement are explicitly stated, without any mention of sharing litigation costs. (*Id.*). As expected, Plaintiffs take a much broader view on the scope of the language of ¶ 5. To this end, Plaintiffs proffer that:

> [t]o "participate in the defense of the Lawsuits . . . as though the . . . . Party were an additional defendant in the Lawsuits" means exactly that: each of the JDA Parties was shouldering all of the responsibilities – financial, discovery related, consultative, etc. – that it would have shouldered had it been a named defendant in the Lawsuits.

(Docket No. 143 at 5). Plaintiffs aver that their position is further buttressed by other provisions in the JDA, such as the parties' agreement to not add the unnamed parties to the state lawsuits and to toll all claims for contribution and/or indemnification until after those lawsuits were fully resolved. (*Id.*). Plaintiffs also impliedly suggest that the JDA would be rendered essentially meaningless without the corresponding agreement of the parties to share litigation costs in the

defense of the state lawsuits. (*Id.*).

Having fully considered the parties' arguments and the language within the four corners of the JDA, in light of the Pennsylvania rules of contract interpretation and construction discussed above, the Court finds that ¶ 5 of the JDA is unambiguous and that the only reasonable interpretation of such language is that the JDA Parties did not agree that they each would contribute a *pro rata* share of all of the defense costs generated in defense of the state lawsuits. *See Murphy*, 565 Pa. at 591. The Court reaches this decision for a number of reasons.

Importantly, as both parties acknowledge, there are no provisions set forth in the JDA which expressly state that the JDA Parties agreed to share all of the defense costs in the state litigation. *See* Pl. Ex. 1. The absence of such express language in an agreement between five sophisticated entities, each represented by able counsel, strongly suggests that the parties had not agreed to the type of *pro rata* fee sharing agreement that Plaintiffs allege was in play during the state cases. *See McMullen*, 603 Pa. at 617; *see also Travelers Cas. and Sur. Co. of America v. Highland Partnership, Inc.*, No. 10-cv2503, 2012 WL 5928139, at *17 (S.D. Cal. Nov. 26, 2012) (finding that a joint defense agreement was an integrated contract and rejecting an alleged oral modification to same which required the party to minimize attorneys' fees and costs because the joint defense agreement was entered into at arm's length between sophisticated businesspeople who were both represented by able counsel). Further, as is discussed in detail below, it is beyond likely if the parties to this agreement truly desired to share defense costs that any such cost sharing agreement would be expressed through much more specific language than the single phrase Plaintiffs rely on here. *See Trizechahn*, 601 Pa. at 652; *see also Travelers*, 2012 WL 5928139, at *16 ("the Court is at a loss to see why, if Defendants drafted the Joint Defense Agreement, they did not include an express provision requiring Travelers to minimize their

attorneys' fees").

This Court's opinion is fully supported by the other provisions in the JDA, particularly ¶ 1, which sets forth the stated purposes of the agreement, and the other more substantive provisions of the JDA which more fully set forth the terms and conditions of same. *See* Pl. Ex. 1 at ¶ 1. Under Pennsylvania law, the Court must assume that the language used by the parties to express their stated purposes for entering into the JDA was carefully chosen. *Murphy*, 565 Pa. at 591. The stated purposes of the parties' relationship included:

> (1) preserving the *status quo* between the Parties;
>
> (2) presenting a joint defense;
>
> (3) maintaining confidentiality; and,
>
> (4) tolling any and all applicable statutes of limitations or repose with respect to the assertion and/or adjudication of any claims, including, but not limited to, claims of negligence, contribution, breach of contract, indemnification, exoneration, payment or otherwise, which exist or may arise by and between the Parties arising out of or relating in any way to the claims asserted by the Claimants in the Lawsuits.

Pl. Ex. 1 at ¶ 1. Again, none of these stated purposes included the parties' desire to share all defense costs or that each party would equally "shoulder" a portion of the financial responsibility of defending the lawsuits, as Plaintiffs advocate. *Id.* In addition, a closer examination of each of these stated purposes (individually and collectively) reveals that the JDA Parties simply did not agree to share defense costs. *Id.* At most, they agreed to share costs associated with an expert witness, if that expert could be used in the party's own defense. *See Id.* at ¶ 5 (the parties' agreed to "share in the cost of experts whose employment can be used in the Party's own defense"). They further agreed, at most, that they were pursuing a joint defense legal strategy or that they had common interests in their respective positions in the state litigation such that they

could share information amongst themselves and discuss a coordinated legal strategy, without subjecting communications which would be otherwise protected by the attorney-client privilege to potential disclosure to the claimants in the state cases. *See Id.* at ¶¶ 1(2), 3.

The JDA Parties' stated expression that they wished to preserve the *status quo* among them is persuasive evidence that they did not agree to jointly share all defense costs under the JDA. *See Murphy*, 565 Pa. at 591. To this end, as stated in the agreement, only Apostolou, Rosser and the Joint Venture had been named as defendants in the state lawsuits while "neither Brinjac nor Moore had been joined." Pl. Ex. 1 at 1. The American Rule represents the *status quo* for these entities because under Pennsylvania law both the named parties and non-parties to the state litigation would be expected to pay their own litigation costs and attorneys' fees, absent a clear agreement to the contrary. *See In re Farnese*, 609 Pa. at 564. In addition, the JDA states that attorneys from Burns White represented Apostolou,[9] Rosser, the Joint Venture and Brinjac, yet Moore was represented by Fypolych, who was then with a different law firm. Pl. Ex. 1 at ¶ 4. Thus, while it is conceivable that the parties which were represented by Burns White may have separately entered into a cost-sharing arrangement by virtue of the joint representation, there is no reason provided in the JDA as to why Moore – *as a non-defendant to the lawsuits and an entity represented by a different law firm* – would have desired to enter into such a cost sharing agreement. *See* Pl. Ex. 1. Because there is no clear language to the contrary, the Court finds that the *status quo* between these entities would not encompass Moore sharing in the defense costs of the other JDA Parties.

Next, the statements at subparagraphs (2) and (3) of ¶ 1 that the parties desired to "present a joint defense" and "maintain confidentiality," when read together, demonstrate the parties' intent to establish written documentation that the joint defense and/or common interest

---

[9]     Again, Apostolou was also represented by its personal counsel, Attorney Nernberg. Pl. Ex. 1 at ¶ 4.

privileges applied in the state cases and thus, protected all inter-JDA Party communications from disclosure. Pl. Ex. 1 at ¶ 1(2), 1(3). This conclusion is further supported by substantive ¶ 3 of the JDA, which explicitly provides that:

> The Parties understand that the joint defense privilege applies to the joint defense efforts of the Parties in this Lawsuit. The Parties recognize and understand that privileged communications between the Parties and the Parties' counsel must be shared with counsel for the other Parties to effectively jointly defend the Lawsuits. As a result, all communications between the Parties and their consultants, through or with counsel, shall be privileged joint defense communications and/or work product.

(Pl. Ex. 1 at ¶ 3). As is noted above, the necessary factual predicates to demonstrate that attorney-client privileged communications are protected under the joint defense or common interest privilege include: (1) the parties' agreement to same; (2) a common-interest in the litigation or a jointly shared litigation strategy; (3) the communications were made pursuant to such agreement, and (4) the continued confidentiality of the communications, i.e., the communications were not disclosed to other third parties such that the privileges were waived . *See Young v. Presbyterian Homes, Inc.*, 2001 WL 753031, 50 Pa. D. & C. 4th 190 (C.P. Lehigh Cty. Jan. 16, 2001); *see also In re Condemnation*, 981 A.2d at 397, n.4. Although an express written agreement is not required to establish these privileges under Pennsylvania law, reducing such an agreement to writing would constitute strong evidence which the parties may have needed to protect the communications among the JDA Parties from disclosure to the opposing parties in the state lawsuits, Pitt and DGS. Indeed, it is recognized as a best practice for attorneys to put such agreements in writing for this very reason and such a sound strategy was employed by the JDA Parties here. *See Young*, 2001 WL 753031, at *n.1 (noting that a written defense agreement existed in the case and commenting that "[c]ounsel seeking to assure the confidentiality of disclosures in future cases would be well-advised to prepare such an agreement

in advance of the disclosures.").  Therefore, the Court concludes that the carefully chosen language in subparagraphs (2) and (3) of ¶ 1 and ¶ 3 of the JDA clearly and unmistakably provide evidence that the parties wished to enter into such agreement in order to preserve the attorney-client privileged communications between them throughout the state litigation.  *See* Pl. Ex. 1 ¶¶ 1, 3; *see also Murphy*, 565 Pa. at 591.

The parties next debate the applicability of the language contained in subparagraph (4) and whether such language constitutes evidence that they agreed to share defense costs or not. (Docket Nos. 129, 131, 136, 137, 140, 143, 144, 147).  In short, subparagraph (4) operates by tolling all statutes of limitations and repose as to potential claims between the JDA Parties arising out of the state cases, "including, but not limited to, claims of negligence, contribution, breach of contract, indemnification, exoneration, payment or otherwise."  Pl. Ex. 1 at ¶ 1(4). When read in conjunction with ¶ 1(1) of the JDA, it is clear that the JDA Parties preserved the *status quo* amongst themselves by setting aside any potential claims that they may bring against the other JDA Parties until the conclusion of the state litigation.  *Id.*  Pursuant to ¶ 8 of the JDA, they then set forth procedural limitations on the length of such tolling, i.e., ninety days until after all of the state law claims were resolved or the JDA was terminated.  *See* Pl. Ex. 1 at ¶ 8. Plaintiffs suggest that this particular aspect of the parties' agreement would not have logically been carried forward without a coterminous agreement amongst the JDA Parties to share defense costs in the state cases.  (Docket No. 143).  In reply, Moore maintains that there is simply no language in the JDA which would support a finding that it agreed to pay such defense costs in exchange for the tolling agreement. (Docket No. 129).

The Court agrees with Moore that the short and succinct language that the parties used in subparagraph (4) of the JDA does not include an agreement to share defense costs or support the

Plaintiffs' proffered interpretation of the duty to participate in the defense of the suits set forth in ¶ 5. *See Murphy*, 565 Pa. at 591. Again, Moore had no direct contractual relationship with Plaintiffs or Apostolou on the PEC project, was a non-party to the state lawsuits and was represented by separate legal counsel from the other entities. While Plaintiffs now advocate that they would not have entered into the JDA without Moore agreeing to pay a *pro rata* share of the defense costs for the state lawsuits and point out the potential benefits to them which could have inured from such an agreement, they fail to articulate any reason why *Moore* would have agreed to pay a *pro rata* share of the defense costs at the outset of the JDA. (*See e.g.*, Docket No. 143). Simply put, Plaintiffs have not sufficiently answered the questions of why Moore, as a non-party to the lawsuits and represented by its own counsel, would agree to: (1) pay its own lawyer; (2) pay a share of defense costs in the state litigation for the other JDA Parties; and, (3) then simultaneously preserve the ability of the other JDA Parties to bring subsequent litigation against it which would necessarily involve paying additional defense costs and fees in this subsequent litigation? While the Court recognizes that there may be conceivable circumstances where an entity in Moore's position may be willing to enter into the type of agreement advanced by Plaintiffs, the Court is not persuaded that such an entity would do so without a "clear agreement of the parties" setting forth the terms and conditions of their cost sharing obligations and a contract without such clear language setting forth the cost shifting agreement is simply not enforceable under Pennsylvania law.[10]

Finally, the Court also rejects Plaintiffs' overarching argument that ¶ 5, and the terms of the JDA, as a whole, create an obligation for Moore to pay a *pro rata* share of defense costs in

---

[10] The Court notes that Plaintiffs maintain that Brinjac paid a share of the defense costs for the state litigation and did so because of the terms and conditions of the JDA in an effort to show that Moore was similarly obligated to do so. The Court disagrees with this position, for the reasons more fully explained in the following section of this Opinion. *See* § V.D., *infra*.

the state lawsuits, as such interpretation is contrary to the plain meaning of the language used in the JDA. *See Murphy*, 565 Pa. at 591. To reiterate, ¶ 5 provides, in relevant part, that:

> each of the Parties will participate in the defense of the Lawsuits, share in the cost of experts whose employment can be used in the Party's own defense, voluntarily attend meetings and provide information as though the dismissed or not-joined Party were an additional defendant in the Lawsuits.

Pl. Ex. 1 at ¶ 5. From this language, the Court concludes that, consistent with Pennsylvania law, the plain meaning of this provision is that the JDA Parties' agreement to "participate" in the state lawsuits required them each to: voluntarily attend meetings; provide information to the other JDA Parties; and to contribute to the costs of an expert witness(es), in the event that the expert's testimony could be used in that party's own defense. *Id.* To the extent that Plaintiffs maintain that the term "participate" is broad enough to encompass such a financial obligation on behalf of Moore, the Court holds that the same is not supported by the plain language articulated in the JDA. *See Murphy*, 565 Pa. at 591. The Court further recognizes that the language in ¶ 5 is not sufficient to create the type of cost-shifting obligation which Plaintiffs seek to enforce against Moore because such a broad interpretation is wholly inconsistent with the American Rule that each party bears its own fees and costs in litigation, absent a clear agreement to shift such financial obligations to the other party. *See In re Farnese*, 609 Pa. at 564. Moreover, even if the Plaintiffs' interpretation of the term "participate" was adopted, which it is not, completely absent from the JDA is any corresponding language addressing the terms and conditions pertaining to the execution of the parties' supposed financial obligations, such as: any statements that insurance coverage provided by Arrowood or its predecessor would be used to fund the litigation; any indications of the types of costs and expenses expected in the state cases, i.e., copying costs, general discovery and e-discovery costs, attorneys' fees, or paralegal fees, etc.;

the approved amounts of payments for these different types of costs and expenses; payment terms stating when any financial obligations would be due; or, collection and enforcement provisions if one of the parties failed to timely pay.[11]  *See* Pl. Ex. 1.

Additionally, the Court believes that the fact that the agreement is silent with respect to the sharing of defense costs does not undermine or inhibit the Court's interpretation that the JDA did not create such an obligation on behalf of Moore.  Indeed, it is this Court's understanding of Pennsylvania law that a joint litigation strategy may be pursued by individuals or entities in both criminal and civil litigation and the parties to same often do not share in the payment of *all* defense costs, particularly attorneys' fees.  *See In re Condemnation*, 981 A.2d at 397.  In these types of arrangements, the parties work together on a joint defense strategy by sharing information and pursuing joint defenses but both sides pay their own legal fees and costs.[12]  *Id.* The plain language of the JDA clearly expresses the JDA Parties' intent to enter into this type of agreement.  *See* Pl. Ex. 1.

For all of these reasons, the Court finds that the unambiguous terms of the JDA provide that Moore did not have any obligation to pay a *pro rata* share of defense costs generated in the state lawsuits.  *See Murphy*, 565 Pa. at 591.  As the Court concludes that this is the only reasonable interpretation of the JDA, summary judgment is appropriately entered in Moore's favor and against Plaintiffs.  *See Atkinson*, 460 F.3d at 452 (the Court "may grant summary

---

[11]     The Court notes that the articles and form cost sharing agreements that it has consulted recommend that parties use specific terms and conditions which set forth the parties cost sharing obligations in significant detail.  *See e.g.,* S.M. Seaman & J.R. *Schulze, Allocation of Losses in Complex Insurance Coverage Claims* § 13:6[b] (2012) (noting several matters that may be addressed in cost sharing agreements, including: "identification and definition of those costs that will be shared as joint defense expenses; the procedure for obtaining contributions from defendants; the procedure for authorizing expenditures; the share or percentage of costs each defendant will play; periodic accounting of funds; and, refunds of unused funds upon termination"); B.C. Nahrstadt & W.B. Rodgers, *In Unity There is Strength: The Advantages (and Disadvantages) of Jointdefense Groups*, 80 Def. Couns. J. 29 (Jan. 2013) ("Key provisions that should be included in the jointdefense agreement include: … (23) Provisions that detail the allocation of fees and costs (dividing costs proportionally, based on the size of each defendant; dividing costs flatly by the number of parties; dividing costs based on the work performed by each defendant").

[12]     In private practice, over thirty years, the author of this Opinion participated in numerous agreements of this type.

36

judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'"); *see also Trizechahn*, 601 Pa. at 653 ("there is no ambiguity if one of the two proffered meanings is unreasonable"). Accordingly, Moore's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.

### D. Alternative Interpretation of the JDA, if Provisions Deemed Ambiguous

Given the Court's holding that the JDA is unambiguous, the extrinsic and parole evidence presented by the parties may not be considered to interpret same and further discussion of such evidence is unnecessary to the disposition of the instant cross-motions for summary judgment. *See Murphy*, 565 Pa. at 591. However, as both parties have presented this type of evidence and alternatively argued their positions on the cross motions for summary judgment, and for the sake of clarity, the Court will briefly explain why it believes that summary judgment is appropriately entered in favor of Moore even if the challenged portions of the JDA would be deemed ambiguous and such evidence was considered.[13]

To do so, the Court must first address a number of evidentiary disputes raised by the parties in their submissions. (Docket Nos. 129, 143). In this regard, Moore contends that certain evidence presented by Plaintiffs, including purported statements to Rosser representative Raymond Ashe by its former counsel, David J. Hickton, Esquire, constitutes "classic hearsay" that may not be considered by the Court in the context of the present motions for summary judgment. (Docket No. 129). In turn, Plaintiffs argue that expert testimony proffered by Moore should be excluded as inadmissible expert evidence which cannot be considered at this stage of the case. (Docket No. 143). Having analyzed the parties' evidentiary objections, the Court finds

---

[13] Given the Court's rulings that summary judgment is appropriately entered in Moore's favor, for all of the reasons expressed herein, the Court declines to rule on Moore's alternative basis for summary judgment, i.e., that Plaintiffs are improperly seeking to recover fees that were previously paid by its insurer, Arrowood. (Docket No. 129).

that the ultimate outcome that Moore is entitled to summary judgment remains unchanged even if the evidentiary objections are both resolved in Plaintiffs' favor. *See Anderson*, 477 U.S. at 247-48. Thus, for purposes of the instant motions, the Court will disregard the expert opinion evidence proffered by Moore but will consider the hearsay evidence of alleged statements made by Mr. Hickton to Rosser representative, Raymond Ashe.[14] *Id.* The Court now turns to its alternative interpretation of the JDA.

As is explained above, the Court has concluded that ¶ 5 of the JDA is unambiguous. *See* § V.C., *supra*. However, if the Court determined that ¶ 5 of the JDA and, specifically, the phrase "participate in the defense of the lawsuits" was ambiguous, extrinsic and parole evidence would be admissible to aid the Court (and, potentially, a jury) in interpreting the agreement. *See Murphy*, 565 Pa. at 591. It is well-settled that "[e]xtrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their

---

[14]    Although the Court declines to expressly resolve these issues, the Court notes that an expert is not permitted to testify as to the law of the case or provide testimony which may invade the province of the factfinder because such legal opinions are generally deemed to not be helpful to the trier of fact. *See FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 221 (W.D. Pa. 2010) (quoting *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006)). Therefore, to the extent that Moore's expert provides an ultimate opinion on the primary legal issue in dispute in this case by providing his interpretation of the challenged language in the JDA, such an opinion would be properly excluded under these principles. *See id.* However, as Moore advocates, if this matter proceeded to trial, an expert opinion as to the general practices of attorneys using joint defense agreements and/or cost sharing agreements would likely be deemed helpful to the trier of fact. *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 2011 WL at 204619, at *6-7 (E.D. Pa. Jan. 20, 2011) (noting that evidence concerning trade use and custom is admissible to interpret ambiguous language in contracts under Pennsylvania law).

    With respect to the challenged hearsay statements attributed to Mr. Hickton, as recounted by Mr. Ashe, the Court understands "that hearsay testimony may be considered by the Court in ruling on a motion for summary judgment if it appears that the testimony can be presented in an admissible form at trial." *Theriault v. Dollar Gen.*, 2:07-CV-227, 2008 WL 2184977 (W.D. Pa. May 22, 2008), *aff'd*, 336 F. App'x 172 (3d Cir. 2009) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 465 n. 12 (3d Cir.1989)). The Court agrees with Plaintiffs that Mr. Hickton could be made available to testify if this matter ultimately was tried before a jury as he is presently working in the capacity as the United States Attorney for the Western District of Pennsylvania and maintains his office on the fourth floor of this courthouse. Thus, his purported trial testimony would likely not be precluded under a straightforward application of the hearsay rules. Insofar as Moore argues that Mr. Hickton's trial testimony should be stricken based on Plaintiffs' alleged failure to depose him or some other violation of the discovery rules, such arguments would be more properly addressed in the context of a motion in limine closer to trial and likely evaluated under Rule 37(a)(1) and Third Circuit precedent governing the exclusion of evidence at trial resulting from alleged discovery violations. *See e.g., Nicholas v. Pennsylvania State University*, 227 F.3d 133, 148 (3d Cir. 2000).

understanding of the contract's meaning." *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.*, 508 F. App'x 180, 183 (3d Cir. 2012) (internal quotation omitted). Here, the extrinsic evidence that the parties have presented includes: a number of draft versions of the agreement; some email communications among the attorneys involved in the drafting of same, containing minimal suggested changes; testimony and other evidence describing the understanding of the agreement by a number of individuals; and, subsequent conduct by the parties throughout the settlement negotiations in one of the state lawsuits and the trial of the second lawsuit. *See* Pl. Exs.; *see also* Def Exs. Having fully considered the parties' arguments and all of the evidence of record, the Court finds that the evidence proffered by Plaintiffs is not sufficient to demonstrate that ¶ 5 of the JDA should be broadly interpreted to include an obligation on behalf of Moore to pay a *pro rata* share of defense costs.

To support this alternative decision, the Court once again starts its analysis with Pennsylvania rules of contract construction. The most pertinent rule in the present circumstances is the doctrine of *contra proferentem*,[15] which is followed by Pennsylvania courts and recognizes the principle that ambiguous language in a contract is construed against the contract's drafter if the opposing party's interpretation is reasonable. *See, e.g., Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) (citing *Sun Co. v. Pennsylvania Turnpike Comm'n*, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) ("Under the rule of *contra proferentem*, any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable.")); RESTATEMENT (SECOND) OF CONTRACTS, § 206 (same); *Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020, 1023 (Pa. Super. Ct. 1997) (citation omitted) ("As a general rule, agreements will be construed against the drafter only when the terms are

---

[15]     *Contra proferentem* is a Latin phrase meaning "against the offeror" and its legal definition is "[t]he doctrine that, in interpreting documents, ambiguities are to be construed unfavorably to the drafter."    "*Contra proferentem*", BLACK'S LAW DICTIONARY (9th ed. 2009).

ambiguous."). It is undisputed that the JDA was drafted by Attorneys Ray, Wissinger and Sorisio of Burns White and that these attorneys, along with Mr. Hickton, who took over the case at a later date, represented all of the JDA Parties, ***except for Moore***. Pl. Ex. 1 at ¶ 4. In addition, the bargaining history of the contract which was developed by the parties in discovery demonstrates that the only meaningful changes to the contract were proposed by Attorney Nernberg, who acted as personal counsel to Apostolou. (Docket Nos. 132 at ¶ 25; 134 at ¶ 25; Def. Ex. 7, *Nernberg Depo* at 63-4). Given same, it is undisputed that the language of the JDA was not drafted by Moore or its representative, Attorney Fylypovych, although he did ultimately approve and execute the agreement on Moore's behalf. (Docket Nos. 132 at ¶¶ 30-1; 134 at ¶¶ 30-1).

In the preceding section of this Opinion, the Court has already determined that the interpretation of ¶ 5 of the JDA that has been proffered by Moore is reasonable. *See* § V.C., *supra*. That is, the Court believes that a reasonable interpretation of the language of the JDA is that it does not create any obligation of Moore to pay a *pro rata* share of defense costs for the state lawsuits. Thus, consistent with Pennsylvania law, the Court concludes that, if the JDA Parties' expression that they each should "participate in the defense of the lawsuits" at ¶ 5 was determined to be ambiguous; such ambiguity must be construed against Plaintiffs and in favor of Moore, which has proffered a reasonable interpretation of ¶ 5 and the JDA. *See Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d at 797. The application of this legal principle is particularly appropriate in this case because two of the attorneys who were tasked with drafting the agreement, Attorneys Ray and Sorisio, testified that the JDA contained no general cost sharing language and did not obligate Moore to contribute a *pro rata* share of the defense costs. (Def Ex. 4, *Ray Depo* at 79-81; Def. Ex. 6, *Sorisio Depo* at 175). Indeed, as the lead attorney on the state lawsuits, Attorney

Ray explained at his deposition that his general practice was not to include any cost sharing language in a joint defense agreement and that he would not have included such language in the JDA. (See Def. Ex. 4, Ray Depo at 79-81 ("There's no language in the agreement to say that" the JDA required any of the parties to share in the payment of legal fees.). Accordingly, summary judgment is appropriately entered in Moore's favor based on this straightforward application of Pennsylvania principles of contract construction.

The Court further comments that this holding is not undermined by the other evidence that has been presented by Plaintiffs. In this Court's estimation, none of the cited evidence is sufficient to demonstrate that Moore, or its authorized representative, ever agreed to contribute a *pro rata* share of the defense costs for the state lawsuits. Simply put, there is no evidence of a "meeting of the minds" between Moore and Plaintiffs (or the other JDA Parties) which demonstrates that Moore agreed to pay a share of the defense costs. *See Scottsdale Indem. Co. v. Hartford Cas. Ins. Co.*, Civ. A. No. 06-5339, 2008 WL 131105, at *3 (E.D. Pa. Jan. 10, 2008) (quoting *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986)) ("'Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intent to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'"). Plaintiffs point to an initial email sent by Attorney Ray to adjusters at Arrowood's predecessor, DPIC, wherein he recommends that the parties enter into a joint defense agreement and agree to, among other things, "share costs." Pl. Ex. 3. However, it is undisputed that the language Attorney Ray included in his email was never expressly incorporated into the JDA, *see* Pl. Ex. 1, and Plaintiffs have not presented any evidence which suggests that Moore or its authorized representative was a party to this initial email communication or ever received or reviewed same. As such, this singular email, which predates

the initial drafts of the JDA and was not incorporated into any of the later versions of the JDA, is insufficient to demonstrate that Moore ever agreed to share defense costs with the other JDA Parties. *See Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986) (citations omitted) ("It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract.").

In addition, the bargaining history, including the changes suggested by Attorney Nernberg which were later incorporated into the final version of the JDA, likewise does not demonstrate that anyone at Moore or its authorized representative agreed to pay a *pro rata* share of the defense costs. Instead, the record is clear that Attorney Nernberg inserted the challenged language in an effort to further explain and clarify the initial version of the JDA, which stated only that "each of the Parties will participate in the defense of this Lawsuit as though the dismissed Party were an additional defendant in this Lawsuit." (Docket Nos. 132 at ¶ 25; 134 at ¶ 25; Def. Ex. 7, *Nernberg Depo* at 63-4). But, Plaintiffs have proffered no evidence – beyond the language which was incorporated in the final version of the JDA and Attorney Nernberg's brief corresponding email – which demonstrates that Moore ever agreed to pay any share of the defense costs under the JDA.[16] Further, in his email, Attorney Nernberg stated that "[a]lthough the term 'participate' is ok …., I would make the obligation to cooperate more detailed, i.e., shall share in the cost of experts whose employment can be used in their own defense, voluntarily attend meetings and provide information, all as though they have been named." (Docket Nos. 132 at ¶ 25; 134 at ¶ 25). Thus, his contemporaneous expression in the email was that he included the suggested language in order to provide a more detailed definition for a previously

---

[16]     Again, the express language of the JDA states only that the JDA Parties agreed to contribute to the payment of expert fees if the expert could be used in that party's own defense. *See* Pl. Ex. 1 at ¶ 5.

undefined term. *Id.* Yet, even if Attorney Nernberg believed that he was expanding through the language of ¶ 5 the scope of the JDA Parties' obligations to share defense costs, his emails with proposed language simply did not articulate cost sharing which Plaintiffs need to sustain their claim. Finally, Attorney Nernberg testified at his deposition that he suggested the language in an effort to "clarify exactly what" the JDA Parties were to do under the obligation to participate contained therein. (Def Ex. 7, Nernberg Depo at 63-4). Thus, his testimony reflects that even he did not view the challenged phrase as broadly as Plaintiffs advocate.

Next, the challenged phone conversation between Ashe and Attorney Hickton, wherein Mr. Hickton purportedly explained to Ashe that one of the purposes of the JDA was to "share expenses and figure out who's at fault later" fails to prove that Moore was aware of Hickton's interpretation of the JDA or agreed to be bound by same. (Docket No. 132 at ¶ 41). Again, there is no evidence that the content of the conversation between Attorney Hickton and Ashe was ever communicated to Moore or its counsel, Fylypovych or that they agreed to such purpose. *Id.* Moreover, it is undisputed that Attorney Hickton was not involved in the initial drafting of the JDA and his later explanation of same to his client, which was made in the context of his joint representation of Rosser, Apostolou, Brinjac, and the Joint Venture – would not be sufficient to bind Moore, an entity which Attorney Hickton did not represent. *Cf. Farris v. JC Penney Co., Inc.*, 176 F.3d 706 (3d Cir. 1999) (noting that under Pennsylvania law an attorney has apparent authority to bind his or her client in litigation matters).

The Court also believes that the evidence concerning the parties' subsequent conduct and communications during the state litigation do not support Plaintiffs' interpretation of ¶ 5 that Moore was obligated to pay a share of the defense costs. (*See* Docket No. 132 at ¶ 44; Pl. Exs. 18-22). To this end, it is undisputed that – aside from obviously paying its own fees and costs as

a non-party to the state lawsuits – Moore has never paid any of the defense costs for the state cases that Plaintiffs seek to recover in this case and has likewise never authorized its insurer, Arrowood (or its predecessor, DPIC) to pay same out of Moore's insurance coverage. Further, the evidence presented shows that Moore's joint participation with the other JDA Parties in the state litigation was minimal. (Docket No. 132 at ¶ 43). The evidence demonstrates that Moore participated with the JDA Parties in the litigation through Attorney Fylypovych on the following occasions: a consultation with Burns White attorneys regarding Moore's responses to written discovery served on it by Cincinnati Insurance Company in September of 2005; a strategy conference call between the attorneys in October of 2005; and another conference call regarding the status of the cases in March of 2006. *Id.*

Later in 2007, when the other JDA Parties were interested in settling one of the lawsuits, Moore declined to join in the settlement. (Docket No. 132 at ¶¶ 44-45; Pl. Ex. 18). The other JDA Parties then expressly reserved the right to pursue claims against Moore and the correspondence between them shows that they all expected to pursue claims against Moore as a result of its decision to not join in the settlement. Pl. Ex. 19. Specifically, the Consent to Settlement states that:

> Nothing herein is intended to modify the Joint Defense Agreement between the joint venture of Apostolou Associates/Rosser International, Inc., Apostolou Associates, Inc., Rosser International, Inc., Brinjac Engineering, Inc. (formerly Brinjac, Kambic and Associates) and Walter P. Moore & Associates, including any rights thereunder.

> A separate right of recovery may exist against Walter P. Moore & Associates, including, but not limited to, rights preserved in the Joint Defense Agreement. Walter P. Moore & Associates has refused at this time to contribute to the settlement. Walter P. Moore & Associates may have to be pursued through litigation.

(Docket No. 132 at ¶ 51; Pl. Ex. 19). When the Pitt lawsuit proceeded to pretrial and trial matters

three years later in June of 2010, similar discussions arose between representatives and counsel for Apostolou, Rosser, Brinjac and the Joint Venture. Pl. Ex. 22. At that point, Attorney Nernberg's correspondence reflects that he reviewed the provisions of the JDA and questioned whether Moore was participating financially to the defense of the action. *Id.* But, again, there is no evidence in the record that this communication was forwarded to Moore, its representative, Fylypovych, and there is certainly no evidence that Moore ever shared the interpretation of the JDA proffered by Plaintiffs. *Id.*

Plaintiffs also rely on the fact that Brinjac, which was likewise never joined in the state lawsuits, authorized Arrowood to contribute to the settlement and defense costs, as supportive of their legal theory against Moore. (Docket No. 143). They reason that Brinjac's decisions were made based on its obligations under the JDA. (*Id.*). However, the issues concerning Brinjac's actions are not before the Court as it is not a party to this litigation and there are no facts of record demonstrating that Brinjac actually interpreted the JDA as requiring it to contribute a *pro rata* share of the defense costs and such an interpretation would be contrary to its own attorneys' view of the agreement. Def. Exs. 6, 7. In any event, the Court believes that Brinjac's actions in contributing to the litigation costs are not controlling on Moore given that these entities held considerably different roles vis-à-vis the PEC Project and maintained significantly different relationships with the other JDA Parties. To this end, it is undisputed that Brinjac had separate contractual agreements with Plaintiffs and Apostolou for the PEC Project while Moore only subcontracted with Brinjac. (Docket Nos. 127 at ¶¶ 4, 5; 138 at ¶¶ 4, 5). Additionally, Brinjac was part of the joint representation group and was represented by Burns White and its attorneys throughout the state lawsuits but Moore had separate counsel and was not a part of this group. (*Id.* at ¶¶ 11, 14). Finally, and importantly, Plaintiffs concede in their briefs that Rosser

subsequently filed a separate action against Brinjac on an indemnity theory, seeking to recover damages from Brinjac based on its liability in the state lawsuits but, to this Court's knowledge, Moore has not been pursued for any alleged deficiencies in the performance of its services during the PEC Project. (*See* Docket No. 143 at 3).

In all, the Court alternatively holds that there are no genuine issues of material fact and that based on the evidence of record, viewed in the light most favorable to Plaintiffs, the only reasonable interpretation of the JDA is that neither Moore nor its authorized representative ever agreed to pay a *pro rata* share of the defense costs in the state lawsuits which Plaintiffs seek to recover through this action such that any ambiguity in the language of the JDA should be construed against Plaintiffs, as the drafters of the agreement. *See Colorcon*, 792 F. Supp. 2d at 797. Further, to the extent that the evidence here is enough to overcome that well-settled legal principle, there is insufficient evidence in the record from which any reasonable jury could render a verdict for Plaintiffs. *See Anderson*, 477 U.S. at 247-48. Accordingly, the Court finds that summary judgment should be entered in favor of Moore and against Plaintiffs even on this alternative basis.

### E. Dismissal of Arrowood's Claims

Having now determined that summary judgment should be entered in favor of Moore in this case, the Court last turns to the only outstanding matter which remains, the Amended Intervenor Complaint filed by Arrowood Indemnity Company against Plaintiffs and Moore. (Docket No. 68). In its Amended Intervenor Complaint, Arrowood seeks a declaration that: if Plaintiffs recover any defense costs in this case, they should be paid to Arrowood; any determinations in this action should be consistent with the determinations in state litigation over the parties' insurance coverage; and any other available relief. *Id.* Further, Arrowood has filed a

Reply in the summary judgment proceedings, wherein it challenges Plaintiffs' suggestion that an appropriate remedy in this case would be to reallocate defense costs among the various insurance policies of the JDA Parties. (Docket No. 141). Given that the Court has entered summary judgment in favor of Moore, Plaintiffs will not be awarded any damages in this case and the challenged reallocation of defense costs will not be ordered. In addition, the Court fails to see how its interpretation of the JDA in Moore's favor has any bearing on the coverage issues raised in the state action. Accordingly, it appears to the Court that all of the issues raised by Arrowood are now moot and its Amended Intervenor Complaint will be dismissed.

VI. CONCLUSION

Based on the foregoing, Moore's Motion for Summary Judgment [126] is granted and Plaintiffs' Motion for Partial Summary Judgment [130] is denied. Appropriate Orders follow.


*/s Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge


Date: August 2, 2013

cc/ecf: All counsel of record.